IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| REBSAMEN INSURANCE, INC. | * |
| Plaintiff | * |
| VS. | * |
| | * NO: 4:08CV00136 SWW |
| JOSEPH DOUGLAS MAYO | * |
| Defendant | * |

**ORDER**

Plaintiff Rebsamen Insurance, Inc. ("Rebsamen")[1] brings this action against Joseph Douglas Mayo ("Mayo") to enforce a non-solicitation covenant. Before the Court is Rebsamen's motion for temporary restraining order and preliminary injunction and Mayo's response in opposition. The motion, which the Court treats as a motion for preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, came on for hearing on March 20, 2008, and closing arguments were heard on March 21, 2008. After careful consideration, and for the reason that follow, the motion will be granted.

**I. Background**

In December 2003, Danny Proctor hired Mayo to work as a producer (an insurance sales agent) at Consolidated Insurance Group ("Consolidated") in Texarkana, Texas. Consolidated,

---

[1] The original complaint names Rebsamen as Plaintiff. However, effective December 31, 2007, Rebsamen changed its name to Regions Insurance, Inc. On March 19, 2008, Rebasamen filed a motion requesting leave to amend the complaint to name Regions Insurance, Inc. as the proper plaintiff in this case, and the Court granted the motion. In this order, however, the Court will refer to Plaintiff as "Rebsamen."

1

founded by Proctor in 1982, offers insurance products to trucking companies. Mayo had no previous experience in the insurance business, and Proctor accompanied him on customer calls during the first year of his employment and provided him training. Consolidated paid Mayo a 40% commission, and Mayo paid for expenses such as out-of-town lodging and customer entertainment. Eventually, Mayo earned annual commissions of approximately $130,000 to $140,000.

In February 2006, Mayo learned that Proctor planned to sell Consolidated to Rebsamen. During the same time period, Proctor presented Mayo with an employment agreement that named Consolidated as the employer and contained a non-solicitation covenant. After consulting an attorney, Mayo told Proctor he would not sign the agreement.

On July 31, 2006, Mayo returned home from a week-long fishing trip in Alaska. Immediately after Mayo returned to the office, Proctor presented him with an "producer employment agreement" that named Rebsamen as the employer and contained a non-solicitation covenant. The sale of Consolidated to Rebsamen was set to close on August 1, 2006 in Little Rock, and each of Consolidated's producers, with the exception of Mayo, had entered a producer employment agreement with Rebasamen the week before. The non-solicitation covenant contained in the agreement reads as follows:

> During employment and for a period of two (2) years following termination of employment, Producer shall not, directly or indirectly . . . (1) solicit, divert, accept, manage, or service any insurance business of Employer's Customers; or (ii) recruit, hire, solicit or attempt to recruit or hire . . . any Other Employee of Employer, nor shall Producer . . . contact or communicate with any Other Employee of Employer for the purpose of encouraging or inducing Other Employee to terminate their employment with employer or to work for any other agent, broker or insurer.

\* \* \* \* \*

> For purposes of this agreement, a "Customer" is defined to include only those individuals, groups, companies, or other entities for whom Producer, at the time of termination, is selling, servicing, managing, or consulting regarding insurance products, or for whom Producer has sold, serviced, managed, or consulted regarding insurance products in the twelve-month period prior to the termination of this Agreement. For purposes of this Agreement, "Other Employee" shall refer to managers, Producers, Clerical, or any Employee or independent contractor who is employed by, or doing business with, Employer at the time of the contact or attempted recruiting or hiring.
>
> * * * * *
>
> Producer . . . acknowledges and agrees that the limitations imposed by the non-solicitation covenant are reasonable and acceptable to Producer, and that they do not impose any greater restraint than is reasonably necessary to protect the goodwill and other business interests of Employer.
>
> * * * * *
>
> Due to the irreparable and continuing nature of the injury which would result from a breach of the covenant, as described above, Producer agrees that Employer may, in addition to any remedy which Employer may have at law or in equity, apply to any court of competent jurisdiction for the entry of an immediate order to restrain or enjoin the breach of this covenant and to specifically enforce the provisions of this covenant.
>
> * * * * *
>
> Producer and Employer acknowledge and agree that . . . the following liquidated damages amount is a reasonable forecast of just compensation. Therefore any violation of this section, in addition to any remedy to which Employer may have at law or in equity, Producer agrees to pay Employer, as liquidated damages, an amount equal to 200% of the gross commissions and any fees billed by Employer or carrier (or Employer's predecessor) to that particular Customer or associated with that particular Customer's account during the twelve-month period immediately preceding the breach.

Def.'s Ex. #1.

After Mayo received a copy of the agreement, he read the following language, which appears above the signature line: "By Executing this Agreement, Producer acknowledges that he or she has been instructed to seek legal counsel, and has had an opportunity to review the terms of the agreement with legal counsel." *Id*. Mayo told Proctor he needed time to consult an

3

attorney. Proctor instructed Mayo to leave the office and see an attorney, but he informed Mayo that he had little time because the sale was scheduled to close the next day.

Mayo's attorney was unavailable to meet with him on July 31, 2006, and he left the employment agreement at her office for review. The next morning, Proctor went to work and inquired as to Mayo's whereabouts. John Woodson, another Consolidated producer, told Proctor that Mayo was at home. Proctor told Woodson that closing the sale to Rebsamen was his "entire life," and it would not occur unless Mayo signed the employment agreement. Woodson offered to talk to Mayo, but Proctor told him to stay out of the matter. At approximately 9:00 a.m., Proctor went to Mayo's house and, to his surprise, he found Woodson there with Mayo. Proctor asked Mayo whether he had signed the agreement, and Mayo replied that he needed more time.

According to Mayo, Proctor became very angry and told him he would be unemployed if he did not sign the agreement and that he would "ki" if he did not sign. Mayo testified that he was aware that Proctor kept a gun in his desk drawer at the office, and he believed that Proctor intended to say that he would "kill" him if he did not sign. Proctor denies that he threatened Mayo in any way. Woodson testified that Mayo and Proctor had a "big confrontation" at Mayo's house, and at one point during the meeting, he blocked Mayo from lunging toward Proctor.

At some point on August 1, 2006, after Proctor left Mayo's house, Mayo signed the employment agreement and left it on Proctor's desk. The sale of Consolidated to Rebsamen closed as scheduled. Proctor received a percentage of the purchase price upon closing, and he will receive the balance provided that Consolidated achieves an annual 30% pretax profit and 7% financial growth.

4

After the August 1, 2006 sale, Mayo worked for Rebsamen for approximately one year and four months. Liam Murphy, a senior vice president for Rebsaman who resides and works in Fayetteville, Arkansas became Mayo's supervisor. However, Mayo continued to work in the Texarkana office, and Proctor continued to oversee his progress.

According to Proctor, Mayo was constantly late, arrived at work with a hangover, and missed appointments with clients. According to Mayo, Proctor subjected him to unbearable pressure. Mayo testified that on one occasion, Proctor threatened to "kick his ass" and threw a trash can at him. Proctor denies that he committed such conduct.

Mayo complained to Murphy and Fred Stone, Rebsamen's chief executive officer, about Proctor's conduct. In an email message to Murphy, Stone, Mayo, and Woodman, dated June 5, 2007, Proctor apologized for "any mistreatment [he] may have caused." *See* Def.'s Ex. #2. Proctor also acknowledged his demanding nature, stating "With Joe and John I tried to encourage, motivate, and yes kick in the pants to get the most out of them." *Id*.

By email message dated December 17, 2007, addressed to Stone and Murphy, Mayo resigned from his position at Rebsamen. Mayo's email message states as follows:

> To whom it may concern:
> 
> As you all know, the culture of job situations in our office have taken a sharp turn over the recent past. I have tried everything in my power to resolve and reconcile disputes that affect the level of productivity that I am capable of achieving. I have recently been made aware that the circumstances that I have been dealing with internally for quite some time are not going to change, and I am going to have to deal with them on my own. The threatening actions taken towards me have not only depreciated my job performance but have also deteriorated my personal relationships. Therefore, I enter my notice of resignation effective Dec. 17, 2002. I appreciate all of the support everyone has given me through these trying times, as you have been there with me.

Plf.'s Ex. #3.

5

Immediately after leaving Rebsamen on December 17, 2007, Mayo went to work for Capps Insurance Agency in Mount Pleasant, Texas. In the four months that Mayo has worked for Capps, he has successfully solicited only two out of approximately sixty-eight[2] customers that he serviced, managed, or consulted regarding insurance products in the twelve-month period prior to the termination of his employment with Rebsamen. Those customers include American Intermodal Transport, Inc. ("American") and Pinch Company ("Pinch"). Mayo estimates that the business he solicited from American and Pinch would earn him $6,500 in annual commissions.

Rebsamen commenced this lawsuit in state court on January 3, 2008, alleging that Mayo violated the non-solicitation covenant in his producer employment agreement with Rebsamen. Rebsamen moved for a temporary restraining order and preliminary injunction enjoining Mayo from soliciting customers in violation of the parties' agreement. *See* docket entry #3. On February 4, 2008, Rebsamen's motion came on for a hearing before Pulaski County Circuit Judge Tim Fox. After hearing the evidence, Judge Fox stated from the bench: "I'll grant the TRO with respect to [non-solicitation of customers and employees] pending further order of the Court." Docket entry #10, Ex. #1. On February 13, 2008, Mayo removed the case to this Court based on diversity jurisdiction.

## II. Subject Matter Jurisdiction and Venue

During the hearing in this Court on March 20, 2008, counsel for Mayo stated that the Court lacks "subject matter" jurisdiction because many of the events at issue occurred in Texas. Mayo's argument is relevant to the issue of forum convenience, not subject matter jurisdiction.

---

[2]*See* Def.'s Ex. #2 (Customer List).

Mayo removed this action to federal court, asserting that the Court has jurisdiction based on diversity of citizenship between the parties and an amount in controversy exceeding $75,000. Rebsamen has not contested diversity jurisdiction, and the Court finds that it has subject matter jurisdiction in this case.

Venue is also proper in this Court because the sole plaintiff is an Arkansas corporation with its principal place of business in Little Rock. *See* 28 U.S.C. § 1391("A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought."). Mayo indicated that he will seek to transfer venue in this case pursuant to 28 U.S.C. § 1404(a) after the Court has ruled on Rebsamen's motion for a preliminary injunction. But the issue of transfer is not presently before the Court.

### III. Motion for Preliminary Injunction

After Mayo removed the case to this Court, Rebsamen moved for adoption, *nunc pro tunc*, of Judge Fox's ruling granting a temporary restraining order. As stated from the bench during the hearing in this matter on March 20, 2008, the Court denies Rebsamen's request to adopt Judge Fox's ruling. Once a case has been removed to federal court, federal law, including the Federal Rules of Civil Procedure, controls the future course of the proceedings, notwithstanding state court orders issued prior to removal.

In this case, Judge Fox did not enter an order imposing a temporary injunction. Additionally, the Court must follow the standard set forth in Rule 65 and federal case law, rather than state law, in determining whether to issue a preliminary injunction.

Under Eighth Circuit precedent, a preliminary injunction may be granted under Rule 65 only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the balance of harms favors the movant; (3) that the public interest favors the movant; and (4) that the movant will suffer irreparable harm absent the restraining order. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc*., 799 F.2d 1219, 1222 (8th Cir.1986), *cert. denied*, 479 U.S. 1070 (1987).

For the reasons that follow, the Court finds that Rebsamen has met its burden.

**Likelihood of Success on the Merits**

Non-solicitation covenants are not favored under the law, but they are enforceable under proper circumstances. Under Arkansas law, such covenants are valid and enforceable provided that they are ancillary to an employment agreement and reasonable under the circumstances. *See Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410, 417-18, 994 S.W.2d 468, 472 (1999); *Rebsamen Insurance v. Milton*, 269 Ark. 737, 742, 600 S.W.2d 441, 443 (Ark. App. 1980). Specifically, the convenantee must have a valid interest to protect, the geographical restriction must not be overly broad, and the time limit must be reasonable.[3]   *Id.* at 743, 600 S.W.2d 443-

---

[3]Texas law provides a similar standard. Under the Texas Business and Commercial Code, § 15.50, which governs the enforceability of covenants not to compete, non-solicitation clauses are enforceable when (1) there is an otherwise enforceable agreement between the

8

44. The burden is on the party challenging the validity of a covenant to show that it is unreasonable and contrary to public policy. See *Dawson v. Temps Plus, Inc*., 337 Ark. 247, 254, 987 S.W.2d 722, 726 (1999)(citing *Madison Bank and Trust v. First Nat'l Bank*, 276 Ark. 405, 635 S.W.2d 268 (1982)).

In this case, the non-solicitation covenant is ancillary to an employment agreement and supported by consideration, employment with a new employer.[4] Additionally, the covenant protects a legitimate interest of the employer. The Supreme Court of Arkansas has recognized that employers have a legitimate interest in protecting against customer appropriation by employees. *See Borden, Inc. v. Huey,* 261 Ark. 313, 316, 547 S.W.2d 760, 761-62 (1977)(citation omitted). This is especially true when, as in this case, an employee deals with customers away from the employer's place of business and develops personal relationships that bind customers to him, rather than the employer. *See Girard v. Rebsamen Ins. Co. ,* 14 Ark. App. 154, 158, 685 S.W.2d 526, 528 (1985)(citing *Borden, Inc. v. Huey,* 261 Ark. 313, 316, 547 S.W.2d 760, 761 (1977)).

The Court further finds that Rebsamen's non-solicitation covenant is reasonable in scope. Although the language of the agreement contains no specific geographic limits, it prohibits Mayo

---

parties; (2) the non-competition covenant is ancillary to a part of the otherwise enforceable agreement at the time the agreement is made; and (3) the covenant contains limitations as to the geographical area and scope of activity to be restrained that are reasonable and no broader than necessary to protect the business interest of the promisee. *See Oxford Global Resources, Inc. v. Weekley-Cessnun* 2005 WL 350580, 4 (N.D. Tex. 2005)(citing *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642, 647 (Tex.1994)).

[4]Mayo testified that Rebsamen offered him superior benefits, including health insurance, than he received working for Consolidated.

9

from soliciting only those customers, approximately sixty-eight in all, that he served in the twelve-month period before his employment with Rebsamen ended. Mayo is free to pursue as customers other trucking companies located in Texas and elsewhere.[5] See *Girard v. Rebsamen Ins. Co.*, 14 Ark. App. 154, 160, 685 S.W.2d 526, 529 (1985)(upholding non-solicitation clause containing customer-specific, rather than geographic, limitations). As for the two-year duration of the non-solicitation covenant, the same time period has been held reasonable under similar circumstances, see *Girard v. Rebsamen Ins. Co.*, 14 Ark. App. 154, 160, 685 S.W.2d 526, 529 (1985)*; All-State Supply, Inc. v. Fisher,* 252 Ark. 962, 965, 483 S.W.2d 210, 212 (1972), and Mayo does not contend that two years is longer than necessary.

Mayo argues that he signed Rebsamen's employment agreement under duress. "A party asserting duress must: show that the duress resulted from the other party's wrongful and oppressive conduct, and not by his own necessity. In addition, he must show that the wrongful conduct deprived him of his own free will and volition." *Hopper v. Garner*, 328 Ark. 516, 524, 944 S.W.2d 540, 544 (1997)(quoting *Cox v. McLaughlin*, 315 Ark. 338, 867 S.W.2d 460 (1993)).

The evidence shows that on August 1, 2006, at Mayo's residence, Proctor urged Mayo to sign Rebsamen's employment agreement without delay, and he informed Mayo that he would not have a job if he did not sign. However, it is undisputed that Mayo signed the agreement after Proctor left his residence, and Mayo had time for cool reflection. Furthermore, Mayo demonstrated in February 2006 that he is capable of saying no to a non-solicitation agreement.

---

[5]Proctor testified that there are 37,000 trucking companies located in Texas, and Mayo provided no evidence to the contrary.

Also relevant, during the year and four months Mayo worked for Rebsamen after he signed the agreement, he complained to Murphy and Stone about Proctor, but he never repudiated the employment agreement or claimed that he signed it under duress. Mayo's willingness to accept the benefits of the agreement tend to negate his present assertion of duress. *See Clark v. Clark, 1981 WL 1010, \*1 (Ark .App. Oct. 28, 1981)*("The law requires promptness in repudiating an agreement alleged to have been induced by duress.") .

In addition to duress, Mayo argues that he should not be held to the non-solicitation covenant because Proctor mistreated him and effectively forced him to resign from Rebsamen. According to Mayo, Proctor's conduct amounted to a breach of an implied covenant of good faith and fair dealing.

During the hearing, Proctor acknowledged that commissions that would have gone to Mayo if he had not resigned increased Consolidated's profits; thus, Proctor may have had a motive to oust Mayo. However, when Mayo complained about Proctor, Murphy and Stone took action. The evidence simply does not support a finding that Rebsamen engaged in the type of conduct necessary to support a finding that it breached an implied covenant of good faith and fair dealing with respect to Mayo's employment agreement.

In sum, the Court finds that Rebsamen will likely succeed on the merits as to the validity and enforceability of the non-solicitation covenant and the claim that Mayo breached the covenant.

**Irreparable Harm**

It is undisputed that Mayo has solicited customers in violation of the employment agreement he signed on August 1, 2006. Although the agreement provides for liquidated

damages in the event of a breach, it also mentions that equitable relief could be an appropriate remedy for breach. The lack of a preliminary injunction would leave Rebsamen "with the Hobson's choice of either filing a separate lawsuit for damages (or at least an amendment to an initial suit) each time [Mayo] solicited away another . . customer or waiting until customers and goodwill have been . . . drained away." *N.I.S. Corp. v. Swindle* 724 F.2d 707, 710 (8th Cir. 1984). Rebsamen has no way of knowing whether Mayo is actively soliciting clients in violation of the agreement. Testimony at the hearing established that an insurance salesman's association with a customer can lead to additional insurance sales of other insurance products to that customer as well as to referrals to potential customers. The Court finds that Rebsamen has estabished that it would suffer a threat of irreparable harm without injunctive relief.

### **Balance of Harms**

The Court finds that the equities balance in favor of Rebsamen. Mayo testified that his current compensation from Capps includes expenses plus an $85,000 annual advance against future commissions, which he must pay back over a three-year period. According to Mayo, the business he solicited from American and Pinch would comprise approximately 40 to 50% of his annual commissions. However, he provided no evidence, other than his own testimony, to support this claim. Mayo's track record indicates that he is a successful salesperson capable of generating annual commissions of $130,000, and the Court finds that granting the requested injunction will not unfairly impede his ability to earn a living. On the other hand, refusing to enforce the non-solicitation agreement would deny Rebsamen contractual rights.

### **Public Interest**

12

The Court finds that the public interest is served by upholding the parties' contractual obligations and that the public interest consideration weighs in favor of issuing an injunction. *See N.I.S. Corp. v. Swindle,* 724 F.2d 707, 710 (8th Cir. 1984)("[W]e find no merit in defendants' argument that the public interest weighs in their favor. To the contrary, if these noncompete agreements are valid, the public interest calls for their enforcement.").

**Solicitation of Remaining Employees**

During the preliminary injunction hearing, Rebsamen requested that, in addition to enjoining Mayo from soliciting customers, the Court also enjoin him from soliciting Rebsamen employees in violation of the non-solicitation agreement. Mayo acknowledged that he contacted Rebsamen employee Cynthia Lightfoot after he left Rebsamen. Lightfoot was a long-time employee of Consolidated, and she became employed by Rebsamen when the company purchased Consolidated. Mayo testified that he offered to help Lightfoot change jobs and told her that, if she left Rebsamen, she could work from home and avoid the drive to work. Proctor testified that insurance agency employees must develop special skills and knowledge and that agencies must invest considerable time and money in training employees. Proctor also testified that Lightfoot and the other twelve employees who transferred from Consolidated to Rebsamen would be difficult to replace.

The Court finds that the portion of the parties' non-solicitation agreement prohibiting Mayo from recruiting or attempting to recruit Rebsamen's employees for a two-year period after termination of his employment at Rebsamen serves Rebsamen's legitimate interest in retaining employees, and it is reasonable in scope. Further, the Court finds that Rebsamen will likely prevail on the merits regarding the validity of the agreement and Mayo's breach thereof. Finally,

the Court finds that Rebsamen has shown it will suffer irreparable harm unless Mayo is enjoined from recruiting its employees, that the balance of potential harms favor Rebsamen, and that the public interest will be served by enforcing the agreement.

**Security Requirement**

Federal Rule of Civil Procedure 65(c) states:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. . . .

In accordance with Rule 65(c), the Court finds that Regions must give security in an amount that bears a rational relationship to Mayo's probable damages in the event that it is later determined that the injunction should not have been entered. *See In re President Casinos, Inc.*, 360 B.R. 262, 266 (B.A.P. 8th Cir. 2007). Mayo testified that he would earn approximately $6,500 annually in commissions from Pinch and American.[6] At the hearing counsel for Rebsamen indicated that Rebsamen is not asking the Court for an injunction as to these two customers, who have already terminated their business with Rebsamen.[7] Mayo did not present any evidence concerning the commissions he might lose as a result of the issuance of an injunction. The Court estimates that the preliminary injunction will be in place for one year, pending a trial on the merits. The Court finds that security in the amount of $10,000 will be

---

[6]The commissions from Pinch were initially much more when Mayo first obtained the business, but the owners of Pinch sold three of their four units, and Mayo thereby lost that business.

[7]The Court finds that the business relationship between Pinch and Proctor is likely damaged beyond repair following a telephone conversation between Proctor and a principal at Pinch.

14

sufficient, considering the commissions that Mayo had taken from business that was covered by the employment agreement.

## IV.

For the reasons stated, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for adoption, *nunc pro tunc*, of a state court ruling (docket entry #10) is DENIED.

2. Plaintiff's motion for a temporary restraining order and preliminary injunction (docket entry #3), which the Court treats solely as a motion for a preliminary injunction, is GRANTED.

3. Defendant Joseph Douglas Mayo is enjoined from soliciting, diverting, accepting, managing, or servicing, directly or indirectly, the customers listed on Plaintiff's Ex. #2, identified during the March 20, 2008 hearing in this case. Defendant Mayo is further enjoined from recruiting, hiring, soliciting or attempting to recruit or hire, directly or indirectly, any other Rebsamen employee.

4. This Order is effective upon its entry and shall remain in effect until further order of this Court--provided that, within ten days from the entry date of this order, Plaintiff posts a bond with the Clerk of the Court, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, in the amount of $10,000.

IT IS SO ORDERED THIS 31ST DAY OF MARCH, 2008.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE